*CONFIDENTIAL*

# INFOIQ™ SERVICE AGREEMENT
## between
## DIGITAL MOTORWORKS, LP
## and
## CREDIT ACCEPTANCE CORPORATION

This InfoIQ Service Agreement ("Agreement") is made and entered into this 20th day of December, 2006 ("Effective Date") by and between DIGITAL MOTORWORKS, LP ("DMi"), a Texas limited partnership with its principal place of business at 8601 FM 2222, Building I, Fourth Floor, Austin, Texas 78730, and **Credit Acceptance Corporation** ("CAC"), a Michigan corporation with its principal place of business at 25505 West 12 Mile Road, Southfield, MI 48034.

1   **Definitions**. As used in this Agreement, the following terms will have the meanings set forth below.

1.1   **Data**. "Data" means information collected from CAC participating Dealerships in accordance and as described in the Statement(s) of Work executed by DMi and CAC pursuant to this Agreement.

1.2   **Dealer or Dealership**. "Dealer" or "Dealership" means a business entity, identifiable by its own street address and/or unique system identifier, which is engaged, in whole or in part, in the sale of new or used motor vehicles, construction, leisure, or farming equipment, boats, recreational vehicles and/or the wholesale or retail sale of parts and/or services related to such vehicles utilizing the proposed services as described in the corresponding Statement of Work.

1.3   **Developments**. "Developments" means any work product, including software, documentation, deliverables, information, know-how, processes, inventions or other materials developed by DMi in connection with this Agreement, including those developed in the course of customization services provided as part of the InfoIQ Services.

1.4   **Enhanced Data**. "Enhanced Data" means Data that has been processed via the InfoIQ Service.

1.5   **InfoIQ Service**. "InfoIQ Service" means any direct or indirect collection of Data by accessing, polling, copying, extracting, downloading, reformatting, aggregating and/or compilation of Dealership Data by DMi using DMi's InfoIQ technology and any applications developed to support CAC or Dealership in the process.

1.6   **InfoIQ Administrator or IA**. "InfoIQ Administrator" or "IA" means DMi's web based CAC manager software.

1.7   **Project Manager**. "Project Manager" shall mean a qualified technical project manager that is an employee of either DMi or CAC and is appointed by either DMi or CAC to manage the responsibilities regarding all design, development, acceptance testing and related work undertaken by DMi pursuant to this Agreement.

1.8   **Statement of Work**. "Statement of Work" (sometimes referred to herein as a "SOW") means a Statement of Work mutually agreed upon by the parties describing the specific services, specific criteria, functional requirements and deliverables to be provided by DMi to CAC projects in accordance with the corresponding InfoIQ Plan along with a stated term and fees. Each SOW shall be numbered sequentially and shall incorporate by reference the terms and conditions of this Agreement.

Exhibit "A"

CONFIDENTIAL

1.9 <u>Bulk Transfer List</u>. A Bulk Transfer List is a list of information that DMi requires to transition CAC dealers to DMi's InfoIQ Service or, after transition, a list of information DMi maintains about CAC dealers enrolled in the InfoIQ Service in order to provide the InfoIQ Service to a specific CAC dealer, such as: dealer name, dealer address, dealer contact information (including technical contact person), dealer DMS, the filters dealer desires to be applied to the Data, and such other information as DMi may obtain from a CAC dealer in order to perform the InfoIQ Services.

2 <u>InfoIQ Services</u>.

2.1 <u>Generally</u>. DMi agrees to use commercially reasonable efforts to provide CAC with the InfoIQ Service according to any Statement of Work then in effect during the Term of this Agreement. DMi further agrees to maintain a Bulk Transfer List for CAC dealers and to provide CAC with the most current version of the Bulk Transfer List upon request, or if no request is made, then not less than quarterly during the term of this Agreement.

2.2 <u>CAC Support</u>. To enable DMi to provide the InfoIQ Service, CAC agrees to use commercially reasonable efforts to assist DMi in gaining access to Dealership Data, CAC participating Dealerships, CAC's computer systems and appropriate personnel to the extent necessary for DMi to provide the InfoIQ Service. In furtherance of this duty CAC shall provide to DMi a Bulk Transfer List containing the information CAC has regarding CAC Dealers. DMi shall not be responsible for any inability to provide the InfoIQ Service in the manner set forth in the Statement of Work which results from the inability of DMi to access Dealership Data or CAC participating Dealerships' computer systems, from the failure of a Dealership to supply specified requested hardware and/or software, where requested information is not present in the Dealerships' systems, or from the failure of Dealership computer systems to meet DMi's technical specifications required to interoperate with the InfoIQ Service or to perform according to their technical specifications. CAC shall not instruct DMi to access a particular Dealership's computer system and Dealership Data unless CAC has first obtained any consent from such Dealership which is necessary for such access. Furthermore, CAC's instruction to DMi to access such system and data shall constitute CAC's representation and warranty that any needed consents have been obtained.

2.3 <u>Purpose of Relationship.</u> The purpose of this relationship is for DMi to provide CAC with Enhanced Data extracted from CAC participating Dealerships in order for CAC to publish such Enhanced Data via CAC's CAPS application so that CAC participating Dealerships can view their vehicle inventory in CAPS.

2.4 <u>Use of Enhanced Data</u>. CAC shall use Enhanced Data solely for the purpose described in Section 2.3 above and shall not copy, make derivative works from, sell, offer to sell, assign, redistribute, disclose, disseminate or otherwise make available in any manner not provided in this Agreement, any Enhanced Data, or any part thereof, or the concept and/or technology embodied therein, to any third party which requires the reformatting or compilation of data using an InfoIQ Service type service, without the prior written consent of DMi in each instance. Except as described in this Agreement, no other rights pertaining to the Enhanced Data are granted to CAC.

2.5 <u>Project Development Personnel.</u> Each party shall designate a Project Manager and notify the other party of its designation prior to the commencement of services to be performed in accordance with the corresponding Statement of Work. Each party shall use reasonable efforts to ensure that the Project Manager assigned to a Statement of Work remains the same individual throughout the term of the corresponding Statement of Work.

*CONFIDENTIAL*

3 **Fees and Payments.**

3.1 **Initial Fees.** In consideration of the payment of the initial fees or development fees, as set out in a corresponding SOW, by CAC to DMi, DMi will commence the provision of the InfoIQ Services. The initial fees and/or the development fees shall be non-refundable. DMi reserves the right to increase the initial fee or development fees at a mutually agreed upon rate before proceeding with the revised Statement of Work to the extent that: (a) delays in the completion of the tasks set forth in the Statement of Work occur at the request of CAC, or are caused by CAC's failure to meet specified deadlines or (b) that any CAC-supplied specifications or requirements on which such obligations and services are based are subsequently determined to be materially inaccurate or inadequate, and as a result of such inaccuracy or inadequacy, the scope or scale of the project contemplated by the Statement of Work increases

3.2 **Monthly Fees.** CAC will pay DMi all monthly fees as set forth in the "Fees" section of a corresponding SOW. The monthly fees shall be non-refundable except as expressly provided in Section 6.

3.3 **Fee Increases.** DMi reserves the right to revise monthly fees and/or development fees to become effective during any renewal Term of this Agreement by giving CAC written notice thirty (30) days prior to the expiration of the then current Term.

3.4 **Reimbursement of Expenses.** When travel is required and approved in advance by CAC, CAC will reimburse DMi for reasonable travel-related expenses incurred by DMi in the course of performing the InfoIQ Services, including coach class air travel, ground transportation, food and lodging. Such travel-related expenses shall be in accord with CAC's travel and expense reimbursement policy in effect from time to time (which CAC shall provide to DMi).

3.5 **Invoices.** All Fees and expense reimbursements shall be payable by CAC within thirty (30) days following CAC's receipt of DMi's invoice. If CAC's procedures require that an invoice be submitted against a purchase order before payment can be made, CAC will be responsible for issuing such purchase order fifteen (15) days before the payment due date. Any fees not paid when due shall bear interest at the lesser of 1.5% per month or the maximum interest rate permitted by applicable law. Any terms and conditions appearing on such purchase orders that are inconsistent with the terms of this Agreement and are not otherwise agreed to by the parties in writing shall be null and void; all InfoIQ Services are provided only under the terms and conditions of this Agreement.

3.6 **Taxes.** All fees are exclusive of taxes. If DMi is required to pay any federal, state or local taxes (other than DMi's income tax or any gross receipts tax of any kind) based on the software or services provided under this Agreement, such taxes shall be billed to and paid for by CAC.

4 **Ownership of Intellectual Property and Data.**

4.1 **InfoIQ Software and Developments.** CAC acknowledges and agrees that all rights, title and interest in the InfoIQ Service and the InfoIQ Administrator, including technology embodied therein and any custom Developments created or provided in connection with or related to this Agreement, including all copyrights, patents, trade secrets, trade dress and other proprietary rights, and any derivative works thereof, shall belong solely and exclusively to DMi or its licensors.

CONFIDENTIAL

4.2 **License to InfoIQ Technology.** DMi hereby grants CAC a non-transferable (except as provided in 9.3) license under DMi's copyrights to use any DMi software products and associated documentation provided to CAC in connection with the InfoIQ Service and InfoIQ Administrator and all such software products and documentation necessary for the performance by DMi under this Agreement during the term of this Agreement and subject to the terms and conditions of this Agreement.

4.3 **Trademark License.** During the Term of this Agreement, CAC grants DMi a revocable, non-exclusive, nontransferable license to use CAC trademarks and trade names on DMi's website and in promotional materials distributed by DMi. DMi shall submit for CAC approval prior to the issuance, publication, or dissemination any publications or other material that may use or display CAC trademarks and trade names.

5 **Confidential Information.**

5.1 **General.** The terms of that certain Non-Disclosure Agreement dated as of October 31st, 2006 between CAC and DMi (the "NDA") is, with the exception of the term stated therein, hereby incorporated by reference. The term of the NDA shall run concurrently with the term of this Agreement.

5.2 **Non-solicitation.** In consideration of each party's obligations under this Agreement, the parties' during the term of this Agreement and for a period of twelve months thereafter neither party shall employ or solicit any employee of the other party who was directly involved in the subject matter of this Agreement.

5.3 **Survival.** Both parties' obligations under this Section shall survive any termination or expiration of this Agreement.

6 **Limited Warranty and Limitation of Liability.**

6.1 **Representations by DMi.** DMi represents and warrants, for the benefit of CAC only, that (i) the InfoIQ Services will be provided by qualified personnel according to workmanlike standards as identified in the Statement of Work and (ii) the InfoIQ Services and any other data processing and conversions provided by DMi under this Agreement will be accurate to the extent that Data provided is accurate, complete and non-repetitive and individual records will be linked to the correct Dealership. CAC's exclusive remedy for breach of the foregoing warranties shall be re-performance of the relevant services, or, if DMi cannot re-perform the relevant services consistent with the warranty, a refund of the relevant fees paid for the services giving rise to the breach. Any software and associated documentation provided by DMi hereunder is licensed AS-IS, without warranty of any kind.

6.2 **Representations by CAC.** CAC represents and warrants that CAC's services and products do not violate and infringe any third party proprietary rights or personal rights, and that DMi's access, use and provision of the Data in accordance with this Agreement (and CAC's use of the Enhanced Data pursuant hereto) does not violate or infringe any third party proprietary rights or personal rights.

6.3 THE STATED EXPRESS WARRANTIES ARE IN LIEU OF ALL LIABILITIES OR OBLIGATIONS OF DMI ARISING OUT OF OR IN CONNECTION WITH THE DELIVERY, USE, OR PERFORMANCE OF INFOIQ SERVICES, INFOIQ SOFTWARE, OR INFOIQ RELATED PRODUCTS. DMI DISCLAIMS ALL OTHER WARRANTIES WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED

CONFIDENTIAL

WARRANTIES OF MERCHANTIBILITY, NON-INFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE REGARDING THE INFOIQ SERVICES, INFOIQ SOFTWARE, OR INFOIQ RELATED PRODUCTS.

6.4   IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY, WHETHER BASED ON CONTRACT, TORT (INCLUDING BUT NOT LIMITED TO STRICT LIABILITY AND NEGLIGENCE), WARRANTY OR ANY OTHER LEGAL OR EQUITABLE GROUNDS, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT IN CONNECTION WITH CAC'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 10.1(b) HEREOF, CAC'S BREACH OF THE REPRESENTATION AND WARRANTY DESCRIBED IN SECTION 2.2 HEREOF, DMI'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 10.2(b) HEREOF AND EACH PARTY'S OBLIGATIONS UNDER SECTION 5 HEREOF, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT FOR ALL CLAIMS EXCEED THE AMOUNT OF ALL FEES PAYABLE FOR THE TWELVE MONTH PERIOD IMMEDIATELY PRECEDING THE MOST RECENT SUCH CLAIM, EXCEPT THAT CAC MAY BE LIABLE TO PAY AMOUNTS DUE BUT NOT PAID UNDER THIS AGREEMENT.

7   Notices.

7.1   General. Notices required under this Agreement shall be deemed given (i) when delivered in writing personally, (ii) when sent by confirmed telex or facsimile, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) day after deposit with a commercial overnight carrier, with written verification of receipt. All communications will be sent to the addresses set forth below (or such other address as either party may subsequently designate):

> For DIGITAL MOTORWORKS, LP:
> Digital Motorworks, LP
> 8601 FM 2222
> Building I, Fourth Floor
> Austin, Texas 78730
> Attn: General Manager
> Fax: 512-692-1167

> For CREDIT ACCEPTANCE CORPORATION:
> John Soave
> National Director of Vehicle Marketing
> 25505 W. Twelve Mile Road
> Southfield, MI 48034-8339

> With a copy to:
>
> Chief Legal Officer
> Credit Acceptance Corporation
> Silver Triangle Building
> 25505 W. Twelve Mile Road
> Southfield, MI 48034-8339
> Fax: 248-353-1915

8   **Term and Termination.**

8.1   **Term.** This Agreement shall commence on the Effective Date and expire December 31, 2008 ("Initial Term"). Upon expiration of the Initial Term, this Agreement will automatically renew for additional two year terms ("Renewal Term") unless either party provides the other written notice of its intent not renew at least ninety (90) days' prior to the expiration of the then current Term. The Initial Term and Renewal Terms shall be collectively referred to herein as the "Term".

8.2   **Termination.** Either party may terminate this Agreement for the other party's material breach and the failure of such party to cure such breach within thirty (30) days after written notice from the non-breaching party (which notice must set forth, in reasonable detail, the nature of such breach). In addition to any other rights and remedies which may be available to DMi as a result of any such breach by CAC, DMi shall be entitled to suspend provision of the InfoIQ Service beginning thirty (30) days following written notice of such breach and until the breach has been cured to DMi's satisfaction.

8.3   **Consequences of Termination.** Upon termination or expiration of this Agreement, all rights granted to CAC hereunder shall immediately cease, and each party shall return to the other party or certify to the other party as destroyed all materials provided by the other party under this Agreement. In addition, DMi shall cease accessing Dealership Data effective upon any such termination or expiration. Further, all obligations of CAC to make payments hereunder shall cease except with respect to services provided by DMi prior to the termination or expiration date.

8.4   **Waivers.** Waiver by a party of any breach by the other party shall not be deemed a waiver of any other or subsequent breach.

9   **Miscellaneous.**

9.1   **Independent Contractor.** DMi enters into this Agreement as an independent contractor. Nothing in this Agreement will be construed as creating the relationship of joint venturers, partners, employer and employee, franchisor and franchisee, master and servant, or principal and agent between DMi and CAC.

9.2   **Force Majeure.** Each party shall be excused from performance under this Agreement (other than performance of obligations to make payment of money) for any period and the time of any performance shall be extended, to the extent reasonably necessary under the circumstances, to the extent that such party is prevented from performing, in whole or in part, its obligations under this Agreement, as a result of any act of God, any governmental authority, war, civil disturbance, court order, labor dispute, third party nonperformance caused by an act of force majeure as defined in this Section, or any other cause beyond its reasonable control, including without limitation failures in telecommunications equipment or lines, Internet connections, or other equipment. Such nonperformance shall not be a default under this Agreement or a ground for termination of this Agreement. However, CAC shall not be under any obligation to pay DMi for any period during which DMi is not performing due to an act of Force Majeure.

9.3   **Assignment.** Except as expressly provided in this Agreement, nothing contained in this Agreement is intended to confer upon any third party any rights, benefits, or remedies of any kind or character whatsoever under or by reason of this Agreement. No party may assign this Agreement without obtaining the prior written consent of the other party which consent will not be unreasonably withheld or delayed (provided either party may withhold consent if the proposed assignee is, or is affiliated with, a competitor of such party). This Agreement will inure to the benefit of and shall be binding upon the parties and their successors and permitted assigns.

9.4 Governing Law. This Agreement will be governed and construed in accordance with the laws of the State of Texas except for its choice of law provisions as applied to agreements entered into and to be performed entirely within Texas between Texas residents.

9.5 Entire Agreement; Modifications. This Agreement, together with any Purchase Orders, attached SOWs and appendices, and the NDA, constitutes the entire agreement between the parties with respect to the subject matter herein and supersedes and replaces all prior and contemporaneous understandings and agreements, whether written or oral, regarding the subject hereof. In the event of a conflict between this Agreement and the terms of a Purchase Order, the terms of this Agreement shall supersede and prevail. No amendment or modification of this Agreement will be binding unless in writing and signed by an authorized representative of each party.

10  Indemnity

10.1 Indemnity by CAC. CAC shall indemnify, defend and hold harmless DMi and its officers, directors, associates, members, partners, employees and affiliates (collectively, the "DMi Indemnified Parties") from and against any loss, liability (including settlements and judgments) or expenses (including reasonable attorneys' fees and expenses and court costs) arising out of or relating to any Claim:

(a) Relating to the inaccuracy or untruthfulness of any representation or warranty made by CAC.
(b) By a third party arising from a claim that any product or service offered or provided by CAC infringes such third party's intellectual property or other proprietary rights.
(c) Relating to payments and fees payable by CAC to DMi hereunder.
(d) Relating to CAC's breach of any of its covenants hereunder.

10.2 By DMi. DMi shall indemnify, defend and hold harmless CAC and its officers, directors, associates, members, partners, employees and affiliates (collectively, the "CAC Indemnified Parties") from and against any loss, liability (including settlements and judgments) or expenses (including reasonable attorneys' fees and expenses and court costs) arising out of or relating to any Claim:

(a) Relating to the inaccuracy or untruthfulness of any representation or warranty made by DMi.
(b) By a third party arising from a claim that the InfoIQ Service infringes such third party's intellectual property or other proprietary rights.
(c) Relating to DMi's breach of any of its covenants hereunder.

10.3 Conditions on Indemnity. The foregoing indemnifications by each party hereto shall be subject to the following:

(a) The indemnified party promptly notifies the other party in writing of the claim; provided that the failure to so notify the indemnifying party shall not relieve the indemnifying party of any liability it may have to the indemnified party hereunder except to the extent the indemnifying party has been materially prejudiced thereby;
(b) With respect to third party claims, the indemnifying party has sole control of the defense and all related settlement negotiations with respect to the claim, provided, however, that the indemnified party has the right, but not the obligation, to participate at its expense in the defense of any such claim or action through counsel of its own choosing; and further provided, that the indemnifying party may not agree to a settlement of any such claim in those instances where the settlement: (i) would require future actions to be performed or omitted by any indemnified party, (ii) could or would impair, impugn, or otherwise damage

the reputation of any indemnified party, or (iii) could or would result in the incurrence by the indemnified parties collectively of aggregate losses in excess of the amounts for which such parties are collectively entitled to be indemnified hereunder; and

(c) The indemnified party cooperates fully to the extent necessary, and executes all documents necessary for the defense of such claim.

11. **Counterparts; Telecopied Signatures.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original for all purposes, and together shall constitute one and the same document. Telecopied signatures shall be relied on as original signatures in all respects.

IN WITNESS HEREOF, the parties have executed this Agreement as of the date first set forth above.

DIGITAL MOTORWORKS, LP

By: _____
Name: Joe Miliziano
Title: General Manager
Date: 12/28/06

CREDIT ACCEPTANCE CORPORATION

By: _____

Name: Steven M. Jones

Title: Chief Origination Officer

Date: 12/22/06

THIS DOCUMENT AND ALL ATTACHMENTS ARE CONFIDENTIAL AND CONTAIN PROPRIETARY INFORMATION. ANY UNAUTHORIZED USE OR DISCLOSURE IS EXPRESSLY PROHIBITED. © 2006, Digital Motorworks, LP.

# DMI InfoIQ
## STATEMENT OF WORK

**Statement of Work ("SOW") Number:** 01
**Credit Acceptance Program Name:** CAPS
**Credit Acceptance Contact:** John Soave
**Term:** Start Date: December 31, 2006    End Date: December 31, 2008
**Date:** December 20th, 2006

This SOW is governed by the Terms and Conditions of the INFOIQ™SERVICE AGREEMENT between DIGITAL MOTORWORKS, LP ("DMi") and Credit Acceptance Corporation ("CAC") dated December 20th 2006.

1. **Description of Services:** DMi will create, maintain, and provide InfoIQ services to support DMS data extraction into the DMi InfoIQ workflow process to load, clean, and export Vehicle Inventory data for CAC.

2. **Definitions:**
    A. <u>Certified DMS.</u> "Certified DMS" means a Dealer Management System that DMi has established methods for data transfer, load and quality assurance processes and, as necessary, made accommodations for DMS specific logic.

    B. <u>Data Deliverable.</u> "Data Deliverable" means a Data export given to CAC for the purpose of user acceptance testing before transitioning program to a production mode.

    C. <u>Software Requirements Specification or SRS.</u> "Software Requirements Specification" or "SRS" means a document containing CAC specific requirements and product configurations to be performed during the implementation of the DMi product(s) detailed in the SOW.

3. **Deliverables & Schedules:**

    A. <u>Product Configuration:</u>

    DMi will deploy an InfoIQ Service environment for CAC utilizing DMi's Vehicle Inventory Data Product (Vehicle Inventory v1.2). This environment will include the data extraction, data cleansing and export file creation routines described in the attached Appendix A: Vehicle Inventory v1.2 Product Guide for Clients. DMi will configure one export file creation routine for each data product. Enhanced Data will be delivered in a delimited, flat file format via secure FTP and compressed using PKZIP.

*DMS Support:*
Certified DMS–
- Vehicle Inventory v 1.2 - ADP Elite, Reynolds and Reynolds ERA, and UCS

Non-Certified DMS without an established automated process including Frazer, Auto Manager, Genesys, Adams, Autosoft, Promax, Automate, and Spicer will be supported through a file upload procedure specified by DMi until such systems are added to our product environment. File must be sent in the format and method specified by DMi. DMi will not be held responsible for providing an automated DMS export process for any non-certified DMS and makes no guarantee all data elements required by CAC are resident on any DMS.

DMi will upgrade CAC from the implemented Vehicle Inventory product to newer product versions as they become available at no charge to CAC. CAC agrees to receive sample exports for testing the new product version. Upgraded product versions will consist of the same functionality as the implemented product. CAC may, at its discretion, receive any new functionality in the product upgrade for an additional fee, as handled through a change control process.

|   |   |
|---|---|
| Vehicle Inventory | |
| 1 | Launch DMi Vehicle Inventory Data Product v 1.2 |

Following the execution of the Agreement, the parties will mutually agree upon the final deployment schedule and within 30 days from the signing of the agreement they will staff the project and schedule the project kickoff meeting. The parties will also use reasonable efforts to negotiate and enter into an addendum to this Statement of Work which sets forth agreed-upon service level commitments from DMi, and the consequences of any failure by DMi to satisfy such service level commitments.

To ensure on-time completion, CAC will be responsible during the development project for:
1) Providing a technical resource to work with DMi during requirements definition and User Acceptance Testing ('UAT').
2) Reviewing and signing the Software Requirements Specification ('SRS') within 2 business days of receipt
3) Providing 2 test Dealers per Certified DMS to DMi within 5 business days of SRS signoff or 4 weeks prior to product configuration completion whichever occurs first
4) Reviewing and signing of the Master Service Level Agreement (which shall be deemed an addendum to, and governed by, the Service Agreement) within 5 business days of receipt

5) Completing all UAT no later than 5 business days following receipt of Data Deliverable

B. <u>Dealer Setup:</u>

DMi will provide a one-time bulk file upload of existing CAC Dealers. DMi will provide CAC with the required file content/format for the file. The upload of this file will populate a work order within InfoIQ Administrator for each Dealer and begin the setup process for InfoIQ Services for the Dealer.

Following the initial bulk file upload, CAC will sign up Dealers by entering a work order for each Dealer within InfoIQ Administrator. Once the work order is created, DMi will:

| | Deliverable Description | |
|---|---|---|
| 1 | Setup the Dealer for each of the following phases of the InfoIQ Service: data extraction, load, clean, and export. | 3 to 5 business days |

C. <u>Dealer Monthly Maintenance:</u>

Upon Dealer setup, DMi will maintain the InfoIQ Service for each data type:

| | | |
|---|---|---|
| 1 | Using the InfoIQ Service: provide on-going Vehicle Inventory Enhanced Data exports to CAC | Monday through Friday |

Data Retention Policy: DMi's default data archiving strategy includes permanent deletion of any records or files that have not been modified in the last 90 days.

4. **Fees:**

A. <u>Upfront Fees:</u> One-time per project fee assessed at time of implementation.

| | |
|---|---|
| Vehicle Inventory Data Product configuration: $9,000 | Waived |
| Transition Fee: Initial Dealer Setup from existing solution (Up to 500 Dealers) | $12,500* |

*\* Based on $25 per Dealer*

B. <u>On-going Dealer Setup:</u>  After the initial launch and setup of up to 500 Dealers, a one-time per Dealer fee of $50 will be assessed at time of Dealer

setup in the InfoIQ Service. DMi will setup each Dealer through the InfoIQ workflow process for each data type.

C. <u>Monthly Maintenance Fees:</u> A per Dealer Monthly Maintenance fee will be assessed for InfoIQ Services on a monthly basis pursuant to the tiered fees outlined in the schedule below. Dealer fees are tiered according to the Dealer counts in a given month and are not retroactive.

| Vehicle Inventory | |
|---|---|
| **Number of Dealers** | **Monthly Fee** |
| First 500 Dealers | $23 per Dealer |
| 501 – 1000 | $22 per Dealer |
| 1000 + | $20 per Dealer |

**NOTE:** For the first 500 Dealers, DMi will bill a monthly minimum of $11,500 for Vehicle Inventory InfoIQ Services.

D. <u>Change Control:</u> any deviation to specifications in this document may be handled through a Change Control process and billed at a rate of $125 per hour.

IN WITNESS HEREOF, the parties have hereunto set their hands and seals as of the date stated at the beginning of this SOW.

DIGITAL MOTORWORKS, LP

By: _[signature]_
Name: Joe Miliziano
Title: General Manager
Date: 12/28/06

CREDIT ACCEPTANCE CORPORATION

By: _[signature]_
Name: STEVEN M. JONES
Title: Chg. a jina Nw Ohio
Date: 12/22/06